GENARO LAFREDO, Respondent, *v.* BUSH TERMINAL COMPANY, Appellant.

324

(Argued March 2, 1933; decided April 11, 1933.)

*Chester Bordeau* for appellant. There was no control by the landlord of the portions of the pier leased where the accident happened so as to make it liable in tort. (*Schick* v. *Fleischhauer*, 26 App. Div. 210; *Kuches* v. *Ginsberg*, 188 N. Y. 630; *Cullings* v. *Goetz*, 256 N. Y. 287.)

*Sidney L. Masone* for respondent. The condition of the pier constituting the negligence upon which the action is based long pre-existed the making of the lease and, therefore, the defendant is liable. (4 Cyc. of Law & Pr. pp. 918, 919.)

O'BRIEN, J. Defendant's Pier 5 in Brooklyn is thirteen hundred feet in length and is divided into four transverse sections, of which C and D constitute the outshore end. Both these sections were leased to Wilhelm Wilhelmsen who took them for the benefit of the Wilhelmsen Line and the Baltic American Line. The lease covers all of sections C and D and, therefore, the leased premises necessarily include that part of the shed erected thereon.

These companies employed the Steamship Terminal Operating Company to operate the two sections. The lease to Wilhelmsen provides that the lessee shall have the "exclusive use" of sections C and D but that defendant, upon reasonable notice by the lessee, shall keep and maintain the premises in repair. Defendant also covenants that it will maintain railroad tracks not only upon the demised premises but also along the entire length of the pier, so as to connect these premises with the railroad terminal bridge operated by defendant, and that it will operate the tracks and move the cars at its own risk and expense. The lease reserves to defendant the right to collect and retain wharfage on all canal boats, barges, lighters and other harbor craft while lying at the leased premises.

Plaintiff, an employee of the Steamship Terminal Operating Company, while engaged outside the shed near the stringpiece at the outer edge of the pier in loading cargo on one of the Baltic American Line's vessels, was injured by the fall of a defective beam which had become insecure above the lintel of a doorway of the shed on the demised premises and which had been inserted there as a rain drip to prevent water falling upon the sill. The distance between the doorway of the shed and the stringpiece near the north edge of the pier is slightly more than two feet.

No questions relating to the unsafe condition of the rain drip or to contributory negligence survive. The record must be searched to ascertain the existence of evidence upon which can be predicated control of sections C and D by this defendant. Control by a landlord out of possession who has covenanted with his tenant to make repairs, must be such as "implies something more than the right or liability to repair the premises. It implies the power and the right to admit people to the premises and to exclude people from them." (*Cullings* v. *Goetz*, 256 N. Y. 287, 290.) In the trial of the case at

bar, the jury was charged that, if there was no absolute control by defendant or if control was not shared by defendant in that part of the pier where the accident occurred, plaintiff could not recover.

In an endeavor to prove control of the leased premises by defendant, plaintiff called five witnesses who were defendant's vice-president, its general superintendent, its superintendent of maintenance and two carpenters employed by defendant. From these witnesses was elicited the following uncontradicted evidence: A railroad extends through a passageway along the entire length of the pier. The cars on these rails were moved on orders from the lessee. This passageway extends uninclosed six hundred and fifty feet from the shore along the north side of the pier outside of and without passing through sections A and B until it reaches section C where a partition described as a solid bulkhead with a door or gate extends across the pier. Sections C and D are reached without passing inside sections A and B. This passageway and railroad continue for the remaining six hundred and fifty feet through sections C and D. Defendant assumed under its lease to keep the railroad and the passageway as well as every other part of the pier in repair. It had no employees on the pier except those who went there to make repairs, it employed no watchman there, did not operate any of the doors on the pier shed and berthed no boats there. Defendant's single witness, the pier superintendent employed by the Steamship Terminal Operating Company which held a contract with the Wilhelmsen Line and the Baltic American Line for operating sections C and D, agreed with the foregoing testimony of plaintiff's witnesses and gave additional uncontradicted testimony. He had full supervision of sections C and D and of the loading, discharge, receipt and delivery of cargoes. He designated the berths for all vessels and he alone designated when and where railroad cars should be spotted. No one else ever did

these things. On one occasion he exerted his authority and prevented this defendant from loading and operating cars for its own use. Only such trucks, including trucks owned by defendant, as went upon the pier for the purpose of transporting cargo of consignors and consignees shipped from and landed at sections C and D, were allowed to pass the gate from the outside passage into section C which was guarded by a watchman employed by the superintendent of the lessee's operating company. No one except him and the watchman had keys to this gate. He controlled its locking and unfastening and designated the persons who were allowed in sections C and D, and had complete supervision over everything pertaining to the management of the pier. The testimony of this witness is not disputed but, assuming that the jury rejected his credibility, the case stands without any evidence produced by plaintiff tending to show even partial control of these sections of the pier by defendant.

This part of the pier was private and it was not let for the purpose of being used as a public place. It was, on the contrary, demised for the " exclusive use " of the lessee and the general public was excluded. Admission past the gate was limited to those whom the lessee's watchman knew to be present on the transaction of business relating to the shipment or receipt of cargo on specified vessels and defendant's servants who went to make repairs. The unsafe appurtenance of the shed which injured plaintiff was not situated on a common way used by other tenants of the pier but was in a location separated therefrom by a bulkhead and a gate. That part of the railroad penetrating into sections C and D and wholly separated from the inshore sections of the pier was operated by defendant under the direction of and solely for the benefit of the lessee and was under the lessee's control. That is the obvious purpose of the covenant. The reservation of the right to collect and retain such wharfage as might accrue from canal boats, barges, lighters and other craft temporarily tieing up at this pier does not make the

premises public. This provision in the lease merely declares that the fees, if any, which might be paid by small craft occasionally seeking shelter, as they have the lawful right to do at every private as well as public dock or pier in the harbor (Greater New York Charter, §§ 859, 863, 865, 867; Laws of 1901, ch. 466), shall belong to the landlord and not to the tenant. Moreover there is no proof that any such craft ever tied up at this pier. So even if defendant had constructive notice of a defect existing when the lessee took possession of these premises for its private use, the decisions create an exemption from liability. (*Campbell* v. *Holding Co.*, 251 N. Y. 446, 448; *Kilmer* v. *White*, 254 N. Y. 64, 69.) There is no evidence in the case except such as shows that the lessee's "possession and dominion were exclusive and complete." (*Cullings* v. *Goetz, supra.*)

The judgment of the Appellate Division and that of the Trial Term should be reversed and a new trial granted, with costs to abide the event.

CRANE, J. (dissenting). The Bush Terminal Company has a large warehouse plant covering blocks of territory on the shore front of Brooklyn, fronting the lower bay of New York. It has one hundred and twenty-one warehouses, eighteen piers, sixteen factory and loft buildings. The loft buildings have six million square feet of loft space, and their warehouses two and a half million. The Bush Terminal Company is primarily in the warehouse business, and the maintenance of the railroads running along the streets and onto the piers and into the loft buildings is all incidental to the warehouse business (fol. 284). The piers run out into the bay thirteen hundred feet — a quarter of a mile, and one hundred and fifty feet wide (fol. 243).

The pier in question when this accident happened, had a railroad running down its entire length connecting with the warehouses and also a passageway for trucks running down the northerly side of it. The sheds on the outer end

of the pier in the sections known as C and D do not cover the entire pier crosswise as there is some distance between the outer wall of the shed and the edge or stringpiece of the pier. The door or doorway of the shed is back from the edge of the pier or stringpiece over two feet two inches from the stringpiece (fol. 67).

Mr. Blackiston, vice-president of Bush Terminal Company, testified regarding the runway: " You might call it a runway or an apron, not enclosed, and runs about 650 feet from the bulkhead line directly out toward the pierhead line of the pier, and that is a runway there which trucks can use to get to the outer end of the pier; otherwise the outer end tenant would have no way of getting ashore with his merchandise. * * * That runway goes through a door into sections C and D, the outer end of the pier.

" Q. And that runway is maintained by your company? A. We maintain that together with the whole pier, so far as general maintenance is concerned.

" Q. And do you use it for the movement of freight for yourselves? A. A shipper turns over business to us and we go out on the pier and get it and load it and bring it in, the same as any other truckman would bring his goods from the pier to the warehouse."

The Bush Terminal Company had leased the end of the pier compartments, known as C and D, to one Wilhelm Wilhelmsen; but that the lessor had retained control over a large part of the pier, including the railroad track, the runway and all the rest of the outer portions of the pier and buildings — in fact all of the pier — for the purpose of maintenance and repair, is beyond question to my mind, by reason of the testimony of its own employees and officers as hereafter quoted. The question in this case submitted to the jury was whether the Bush Terminal Company had retained possession and control over the pier for the purpose of making repairs, and whether

this is a duty which it had assumed and a control which it had retained.

The accident happened in this fashion. A ship was alongside the pier into which stevedores were loading drums of gasoline. They were hoisted by means of a derrick on board the ship. A skid or inclined plane ran from the dock up the side of the ship and the drums were hauled up the skid. The purpose of the skid was to prevent drums striking the ship. The plaintiff stood on the dock *outside the shed* beyond the doorway of the ship guiding the drums up the skid. A man stood on the rail of the ship giving directions to the winchmen when to lower and raise. Over the doorway of the shed was a heavy piece of timber used as a raindrip. It was sixteen feet long, about twenty inches wide and about eight inches thick. It had been loose for some time, for months. The nails were rotten and it had broken away an inch or two from the shed. This fell on the plaintiff's head and injured him. It was like the falling of the cornice off the outside of a building and striking a person on the street, or the falling of a ceiling in the hallway of an apartment house upon a truckman carrying goods out of an apartment. The plaintiff was not the employee of the lessee or the lessor; he was a stevedore standing on a dock outside of the leased sheds, struck by a cornice or a raindrip falling off the shed.

Whose duty was it to make these repairs? We are told by the employees and officers of the Bush Terminal Company, and surely they should know. Ward L. Sturges was the general superintendent of the Bush Terminal Company. The following questions and answers were brought out by the attorney for the defendant. Sturges had been called by the plaintiff and was under cross-examination by the attorney for the Bush Terminal Company, and gave the following answers (fol. 280):

" Q. Mr. Sturges, who makes repairs to damage por-

tions of sections C and D, pier 5, and who made repairs immediately preceding March 20, 1927? A. Why, the Bush Terminal Company.

" Q. And that was under your direction and control at that time? A. Yes.

" Q. If you noticed something out of repair would you proceed to repair it or wait? A. We certainly would, yes.

" Q. You would proceed to repair it? A. Yes. I occasionally walk around the plant. I have no special time.

" Q. And of course, if you saw anything out of repair — A. We would fix it."

Gustav A. Anderson, the superintendent of construction and maintenance of the Bush Terminal, testified that he regularly inspected these two sections, C and D, of Pier 5 for the purpose of determining whether there was any disrepair (fol. 380); and at folio 383 gave these answers:

" Q. When you think anything is to be done you go out there and do it, don't you? A. Yes.

" Q. And how many men have you under you who make repairs to that pier? A. About fourteen men, carpenters and dock builders, and so on.

" Q. Can you go about on that pier, at the end of it, in sections known as C and D, whenever you want to and whenever your men want to? A. Oh, I guess we can, yes.

" Q. And you have done it all the time? A. Yes.

" Q. What kind of repairs do you make? A. Well, in case anything would be loose or falling, or anything like that, and we see it, we are told to do such repair.

" By the Court:

" Q. Do you wish this jury to understand that where you saw, as you testified, things loose or falling that you made repairs without instructions? A. Yes.

" Q. Without any instructions? A. Without any instructions. We repair them things. If we see anything loose or falling we are ready to repair that at our

own risk, as we see it. When we are going through the premises there we always look if there is anything necessary to be repaired. If we see anything like that that is off, we will repair it without any question."

As to this particular raindrip which fell the witness testified: "We have went over there. and nailed them, because we have been nailing them over and always look after them. We have inspection and always try and look after them." (fol. 401).

Here is ample evidence to show the custom and the practice pursued by the Bush Terminal Company in leasing out the various sections or compartments on its vast acreage of piers at its enormous warehouse plant. It kept and retained general supervision over the entire plant and all the piers. It employed a staff of mechanics under a general superintendent of construction to inspect all the piers and sheds and make repairs. It did make repairs on the very raindrips in question. It retained control of the piers for its railways and driveways. It not only assumed the duty of making repairs and retained control for this purpose, but its own officers and employees testified that they actually made these repairs without consultation, without the consent of the tenant lessee. The trial justice properly left it to the jury to say whether the falling of this raindrip upon the plaintiff was due to the negligence and carelessness of the defendant's employees, and whether or not it had and assumed the duty of making the repairs by reason of the control which it had retained. How can we say that there was no evidence to show that the duty of repair was upon the defendant, when defendant's officers and employees admit that it was, and that they undertook to make repairs upon this very raindrip?

I think the judgment for the plaintiff should be affirmed.

POUND, Ch. J., LEHMAN, KELLOGG and CROUCH, JJ., concur with O'BRIEN, J.; CRANE, J., dissents in opinion; HUBBS, J., not voting.

Judgments reversed, etc.